**2024 UT App 46**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
HAROLD WADE MEIK,
Appellant.

Opinion
No. 20210774-CA
Filed April 4, 2024

Third District Court, Tooele Department
The Honorable Dianna Gibson
No. 211300119

Emily Adams and Melissa Jo Townsend, Attorneys
for Appellant, assisted by law students Addison
Blair, Jacob Hibbard, and Jaden Steeves[1]

Sean D. Reyes and David A. Simpson, Attorneys for
Appellee, assisted by law student Paige Skousen

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1     A jury convicted Harold Wade Meik of one count of aggravated assault. Meik now appeals, raising several claims of ineffective assistance of counsel. For the reasons set forth below, we affirm.

---

1. *See* Utah R. Jud. Admin. 14-807 (governing law student practice in the courts of Utah).

## BACKGROUND[2]

¶2    On February 25, 2021, Meik, a resident of Wendover, paid a visit to Grantsville, his former home. Meik later said that the purpose of this trip was to check on his P.O. box and to consolidate some items that he was storing in two storage units.

¶3    In his direct examination at trial, Meik said that around 5 p.m., he decided to see if his brother (Brother) was home. Meik said that he wanted to talk to Brother about some money that he thought Brother owed him, as well as his belief that Brother was having an affair with Meik's wife (Wife) and was providing her with drugs. During his cross-examination, however, Meik gave a different reason for his decision to go to Brother's house. Meik said that he saw Brother's SUV in the post office parking lot around 5 p.m. and thought that Brother had been "stalking [him] around." Meik said that he "drove around Grantsville for several minutes trying to shake" Brother before deciding to go to Brother's house. When asked why he hadn't mentioned this alleged motive earlier, Meik said, "I guess I missed that detail."

### Initial Confrontations

¶4    Whatever the reason, Meik drove to Brother's neighborhood in a truck. As Meik drove toward Brother's house, he passed Brother, who was driving out of the neighborhood in an SUV.

¶5    Meik and Brother then had two brief confrontations—one on the road, and one in front of Brother's house—and the men

---

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Suhail*, 2023 UT App 15, n.1, 525 P.3d 550 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023).

later gave conflicting accounts about what transpired during each confrontation.

¶6     According to Brother's account (which was given under oath at trial), he and Meik passed each other on the road, at which point each of them had their driver's windows halfway down. When Brother said, "Let's go talk," Meik responded by saying "F off" or "F-you" and then drove past him. Brother assumed that Meik was there to talk with him, so he pulled over at the "exit of [his] neighborhood" and waited several minutes for Meik to loop back around. When Meik didn't appear, Brother became concerned that Meik had gone to his house and might hurt his wife or their child, so he started driving home. Brother testified that as he approached his house, Meik started to drive toward him "like he was going to try to hit [him]." Brother said that he swerved across his grass to avoid Meik's truck. Brother then turned around and, through their open windows, again offered to talk. He said that Meik responded favorably to the invitation and motioned for Brother to follow him.

¶7     Meik described these events differently. According to Meik, he stopped his truck on the side of the road when he pulled into the neighborhood and saw Brother pulling out of his driveway. Meik said that when Brother saw him, Brother "cut it short and basically peeled out across the front of his lawn and passed [him] on the wrong side." Meik said that they didn't exchange words and that he didn't have his window rolled down anyway because it was cold. After Brother left, Meik turned his truck around and parked in front of Brother's house, anticipating his return. Meik said that when Brother returned, Brother "came at me head on and gassed it and went across his lawn again." Meik believed that Brother was not prepared to have a "civil conversation," so he drove out of the neighborhood. After Brother "raced" to catch up with Meik, Meik decided to pull over in a "safe place" where they could have a "conversation" around "witnesses and surveillance."

*The Fight*

¶8    Meik pulled into the parking lot of a nearby store, and Brother soon followed him in. They parked their vehicles about ten feet apart. A tan SUV was parked next to Meik's truck, and that section of the parking lot was otherwise empty. A mother (Mother) and a daughter (Daughter) were inside the tan SUV at the time.

¶9    Brother and Meik provided differing accounts of what happened next. According to Brother, he was the first one to exit a vehicle, and after doing so, he looked around for Meik. He said that he could see that Meik's driver's seat was empty but didn't recall if he could see the passenger side or not. While standing by the driver's door of his SUV, Brother looked back in and noticed a hammer on the floor that he had used to repair the SUV's battery earlier that day. Brother testified that he suddenly thought he might need the hammer if Meik "trie[d] to attack" him, so he reached into the SUV and grabbed it. Brother testified that as he was turning back around, Meik approached him and stabbed him in the stomach. Lashing out in self-defense, Brother "struck [Meik] in the face" with the hammer.

¶10    Meik's account was different. According to Meik, he exited his truck before Brother had even parked. Meik said that he was waiting a short distance away from the driver's door when Brother pulled up "right where [he] was standing," got out of his SUV with the hammer already in hand, and then swung at Meik "with the biggest swing he could," hitting Meik "right in the head." Meik testified that he then turned back to his truck, opened the passenger's side door, and retrieved a hunting knife from his glove compartment to defend himself. Meik said that Brother followed, "swinging at [him] the whole time." Meik said that, at some point during this process, he pulled a "winter cap" out of his "belt line" and put it on his head and his coat hood over that to protect himself. Meik also said that during a short gap between what he described as otherwise constant attacks, Meik

unsheathed the knife and stabbed Brother in the stomach. Meik said that when Brother "backed up" to "check[] his wound," Meik reached inside his truck, closed his glove compartment, and then closed the passenger's side door, so as to prevent Brother from "doing any damage" to his vehicle.

¶11 Four eyewitnesses observed most of the fight: Mother and Daughter, as well as a couple who lived across the street from the store (Resident 1 and Resident 2). At trial, Mother testified that the two vehicles parked in close proximity to each other. Additionally, Mother testified that she saw Brother leave his vehicle first, after which Meik walked around his truck and met Brother "in the middle" of the two vehicles. She said that she never saw Meik return to his truck or open the passenger's side door. She could not make out specific details of the ensuing fight; from her perspective, the two men appeared to be "horse-playing."

¶12 Daughter's recollections were mostly similar to Mother's. She agreed that the vehicles were "pretty close" to each other. She also saw Brother exit his vehicle first, followed by Meik, and she recalled seeing the two men meet in the middle. Like Mother, Daughter said that she never saw Meik return to his truck. Daughter also added one additional detail: namely, she testified that she saw Meik "pull[] something out of his pocket." While she couldn't tell for sure whether it was a weapon, she saw Brother run away after he saw Meik pull it out.

¶13 For their parts, Resident 1 and Resident 2 observed the initial moments of the fight through the window of their house. Resident 1 remembered thinking that she was looking at "dark figures" "[w]restling with each other" at first, and Resident 2 similarly recalled seeing two men "kind of wrestling."

*The Flight*

¶14 At trial, everyone (including Meik) agreed that after the initial exchange of blows, Brother turned and fled toward a barbed wire fence behind the store and that Meik pursued him. Resident 1 saw that "one was chasing the other." In Resident 2's recollection, "one gentleman started running off and the other one pursued after." And Mother and Daughter, who were able to distinguish Brother and Meik by the make of their vehicles, both testified that Brother ran away and that Meik pursued him.

¶15 Brother testified that while he was running away, he occasionally "look[ed] back" to keep an eye on Meik's pursuit. At one point, just as Brother felt he was about to "go down" due to blood loss from his stomach wound, he turned and took "one last swing with the hammer" before collapsing. The blow connected with the back of Meik's head, causing Meik to collapse on the ground with Brother. After they fell, Brother said that Meik "jumped on top of" him.

¶16 Meik conceded that he followed Brother, knife in hand. In his direct examination, he testified that he "chased" Brother and that Brother was "running" and "swinging the hammer the whole way," though he claimed in cross-examination that Brother "never ran." Meik also said that Brother "was going backwards swinging the hammer. He didn't run." And although Brother had claimed that the two fell to the ground after he struck Meik with the hammer, Meik claimed that he had tackled Brother.[3]

---

3. The various eyewitnesses disagreed somewhat on this point. Residents 1 and 2 both agreed that Brother got caught on the barbed wire fence; from there, Resident 1 said that Meik "took control and was on top of [Brother] for the remainder of the time," while Resident 2 said that Meik "was able to catch up to [Brother] and took him to the ground." Mother, however, simply said that

(continued…)

¶17 Meik offered two motives for tackling Brother. During his direct examination, he testified that he "basically tackled [Brother] to secure the hammer." But during his cross-examination, he claimed that he chased Brother to render first aid, and that since he believed that the best treatment for Brother's knife wound was for Brother to "lay on his back," that's why he tackled him.

*The Struggle on the Ground*

¶18 Once on the ground, the brothers struggled over the weapons. Brother testified that he was "face down" when Meik jumped on top of him. Brother said that he tried to throw the hammer and knife beyond the fence while Meik tried to "keep them in [the] area." Brother said that when Meik managed to grab the knife off the ground, Brother grabbed "half the blade and part[] of the handle" with his fingers in an attempt to prevent Meik from using it against him, and that during this struggle, Meik stabbed him. By contrast, Meik said that after he tackled Brother "to his back," Brother "stabbed himself in the right shoulder" while attempting to take the knife from Meik.[4] Meik said that although Brother asked Meik several times to "let [him] go," Meik refused, insisting, "[W]e're both hurt and we both need medical attention."

¶19 By this point, Mother and Daughter had driven down the street for safety and did not see much more. Resident 1 and Resident 2, however, had stepped out onto their porch to observe the fight more closely. From that vantage point, Resident 1 heard

---

the two "kind of struggled" and that "they went from struggling to the ground." Daughter said that they "just fell. That's all [she] saw."

4. A responding officer testified that Brother "was facing down" when he arrived on the scene. When asked about this contrary testimony on cross-examination, Meik explained that Brother "worked himself to his belly by the time [the officer] got there."

someone say, "Drop the fucking knife," and, "He's going to F-ing stab me. Call 911." As Resident 1 went inside and called the police, Resident 2 relayed the fight to her. Resident 2 heard one man say that he was "trying to get" the other man "not to stab him."

¶20    A store employee (Employee) who had come outside to take the trash out also saw the struggle by the fence. She threatened to call the police if the brothers didn't "knock it off." She heard one of them yell, "Call the cops. He's fucking stabbing me." The "other one" then yelled, "He hit me in the head with a fucking hammer." Employee called the police, who arrived shortly thereafter.

¶21    The first officer on the scene (Officer) testified that he saw two men "laying in the dirt," one on top of the other, fighting over a knife. He ordered them to separate from each other. Meik obeyed, and Officer then handcuffed him. When Officer attempted to handcuff Brother, however, Brother "cried out in pain." Several additional officers and an ambulance arrived. When one officer untucked Brother's shirt, Brother's "intestines or something" came "bulging out of [his] stomach a couple inches." Brother was airlifted to a hospital in Salt Lake City, where he stayed for seven days and went through numerous surgeries. By contrast, Meik had a "laceration on the top of his head" and "a small laceration on his face." Officer transported him to a local hospital.

¶22    When officers inspected the scene, Brother's SUV was still running, and the driver's door was "ajar." Meik's truck was also running, but none of its doors were open.

*Trial*

¶23    The State charged Meik with attempted murder or, in the alternative, aggravated assault resulting in serious bodily injury, as well as one count of stalking. Meik requested and obtained a self-defense instruction. At trial, the State called 10 witnesses:

Brother, Mother, Daughter, Resident 1, Resident 2, Employee, and four police officers. Meik testified in his own defense and was the only defense witness.

¶24   In addition to the testimony described above, Brother recounted two previous incidents in which Meik had come to Brother's house "looking for an argument." In both instances, Brother said that Meik had accused him of sleeping with Wife. In one of the incidents, Brother said that he told Meik not to come back or he would call the police; later that night, Meik texted him, "Try that again and it will be your last breath."[5]

¶25   The State also asked Brother whether, prior to the parking lot altercation, he had been "aware of any violence" involving Meik and Wife. Brother described two such incidents. Regarding the first, Brother said that Meik had told him that, in 2018, Wife had temporarily left Meik and had been granted a protective order against him. While describing what he had heard about this incident, Brother testified that Wife had told him that Meik was "mean" to her and "jealous" and that he would "keep her from leaving"—although "she never said, like, he hit her or whatever."

¶26   The second involved a previous neighbor (Neighbor) of Meik's. Meik had apparently thought that Neighbor was having an affair with Wife for the last 20 years. Brother testified that Meik told Brother that he was "watching" Neighbor and that Neighbor "was going to get it." According to Brother, Meik also told Brother he had "popped a couple shots at" Neighbor's truck and that Neighbor had obtained a protective order against him. At the conclusion of this line of questioning, the State asked Brother if he had been aware of these events "prior to the incident" between them in the parking lot on February 25. Brother said he had been.

---

5. On appeal, Meik concedes that these incidents were admissible as substantive evidence of the State's stalking charge and therefore does not challenge the admissibility of testimony about them.

The State then asked him, "Is that why you pulled out the hammer?" Brother replied that it was.

¶27 During his testimony, Meik acknowledged having accused multiple people—including Brother, Neighbor, and even his own son—of carrying on affairs with Wife. He also acknowledged that Wife had obtained a protective order against him. But he denied ever having bragged about "shooting up" Neighbor's truck or having any knowledge of Neighbor's protective order.

¶28 Meik also testified that Brother "had been aggressive before." In particular, Meik claimed that Brother had "attempt[ed] assault" against him three times before, once at a gas station and twice in front of Brother's house. On each occasion, Meik claimed that Brother had the same hammer that he used on February 25. Meik claimed that on two of the occasions, Brother had "swung" the hammer at Meik, though he had stopped "short of hitting" him, in apparent attempts to "provoke [him] into an altercation."

¶29 At the close of the three-day trial, the jury acquitted Meik on the attempted murder and stalking counts, but it convicted Meik of aggravated assault. Meik appeals.

ISSUES AND STANDARD OF REVIEW

¶30 Meik raises three claims of ineffective assistance of counsel. First, Meik claims that his counsel (Counsel) was ineffective for failing to object to Brother's testimony about Meik's prior acts of aggression toward Wife and Neighbor, which Meik argues were inadmissible under rule 404(b) of the Utah Rules of Evidence. Second, Meik contends that Counsel was ineffective for failing to request advance notice from the State of these "other acts" under rule 404(b). And third, Meik argues that Counsel was ineffective for failing to object to Brother's testimony about Wife's statements about Meik's behavior during their marriage, arguing that this was hearsay. "When a claim of ineffective assistance of counsel is

raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Alarid*, 2022 UT App 84, ¶ 24, 514 P.3d 610, *cert. denied*, 525 P.3d 1261 (Utah 2022).

ANALYSIS

¶31   To prevail on an ineffective assistance claim, Meik must show (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Meik must establish both prongs. *See State v. Suhail*, 2023 UT App 15, ¶ 126, 525 P.3d 550, *cert. denied*, 525 P.3d 730 (Utah 2023). If either is lacking, "the claim fails" and this court "need not address the other." *State v. Nelson*, 2015 UT 62, ¶ 12, 355 P.3d 1031.

¶32   To establish deficient performance, Meik must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotation simplified). The focus of this inquiry is reasonableness, and we "judge the reasonableness of counsel's challenged conduct, viewed as of the time of counsel's conduct." *State v. Carter*, 2023 UT 18, ¶ 45, 535 P.3d 819 (quotation simplified). "Because the decision not to pursue a futile motion is almost always a sound trial strategy, counsel's failure to make a motion that would be futile if raised does not constitute deficient performance." *State v. Powell*, 2020 UT App 63, ¶ 20, 463 P.3d 705 (quotation simplified).

¶33   To establish prejudice, Meik "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Bonds*, 2023 UT 1, ¶ 53, 524 P.3d 581 (quotation simplified). "A verdict or conclusion only

weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696 (quotation simplified).

## I. Failure to Object to Prior Bad Acts

¶34 Brother testified about several violent or aggressive incidents that had previously occurred between Meik and either Wife or Neighbor. We address two of them here: (1) that Meik had threatened Neighbor with retaliation for allegedly sleeping with Wife and that Meik had then "popped a couple shots" at Neighbor's truck, and (2) that Meik "was just aggressive" toward Wife and "wouldn't let [her] do basically anything."[6]

¶35 Meik argues that Counsel rendered ineffective assistance by not objecting to this testimony under rule 404(b) of the Utah Rules of Evidence. "The Utah Supreme Court has held that bad acts evidence is admissible if three requirements are met." *State v. Balfour*, 2018 UT App 79, ¶ 28, 418 P.3d 79; *see also State v. Green*, 2023 UT 10, ¶ 63, 532 P.3d 930. First, the court must "determine whether the bad acts evidence is being offered for a proper, noncharacter purpose." *Balfour*, 2018 UT App 79, ¶ 28 (quotation simplified). "Second, the court must determine whether the bad

---

6. As part of his rule 404(b)-based ineffective assistance claim, Meik also argues that Counsel should have objected to testimony that Neighbor and Wife had both obtained protective orders against Meik. We're cognizant of Meik's assertion that the protective order evidence might stand on somewhat different analytical footing than the other evidence at issue in this claim—both in terms of its potential relevance and the potential for unfair prejudice. But to establish ineffective assistance, Meik must establish both deficient performance and prejudice. We need not (and do not) decide whether Counsel performed deficiently by not moving to suppress the protective order testimony. Instead, in Part III below, we conclude that Meik was not prejudiced by the admission of this testimony.

acts evidence meets the requirements of rule 402, which permits admission of only relevant evidence." *Id.* (quotation simplified). "Finally, the trial court must determine whether the bad acts evidence meets the requirements of rule 403." *Id.* (quotation simplified).

¶36    Here, we conclude that the evidence in question was admissible under this three-part test. As a result, Meik has not shown that Counsel performed deficiently for not making this objection.

A.    Rule 404(b)

¶37    "The threshold 404(b) question is whether the evidence has a plausible, avowed purpose beyond the propensity purpose that the rule deems improper." *State v. Thornton*, 2017 UT 9, ¶ 58, 391 P.3d 1016 (quotation simplified). "If it does then the evidence is presumptively admissible (subject to rule 402 and 403 analysis)." *Id*. Proper purposes under rule 404(b) include those enumerated in the rule itself—to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Utah R. Evid. 404(b)(2). This list, however, is "illustrative and not exclusive." *Green*, 2023 UT 10, ¶ 70 (quotation simplified).

¶38    In *State v. Labrum*, 2014 UT App 5, 318 P.3d 1151, we addressed this rule in a case involving many of the same dynamics at issue here. In that case, there had been a violent confrontation between the defendant and his wife; the defendant's wife had armed herself with keys and had used them against the defendant during that confrontation; the defendant was later charged with assault; and at trial, the defendant raised a claim of self-defense, claiming that his wife had been the aggressor. *Id*. ¶¶ 2–9, 18–23. Against this backdrop, the trial court in *Labrum* allowed the State to introduce evidence of the defendant's "prior acts of violence" to support the wife's

testimony that "she armed herself with the keys to protect herself," rather than to "ambush" the defendant. *Id*. ¶ 23.

¶39 On appeal, we upheld the admission of this evidence. We noted that rule 404(b) generally allows evidence of prior acts for the purpose of showing "context" and that it more particularly allows such evidence to show a "victim's state of mind," including "the victim's fear of the defendant." *Id*. ¶ 22. Applying those principles to the facts of that case, we held that

> without an understanding that [the] wife had reason to fear [the defendant], the State would be unable to explain why she brought the keys to bed and would be unable to challenge effectively [the defendant's] testimony that [the] wife was the aggressor and that he was merely defending himself.

*Id*. ¶ 23.

¶40 The same is true here. Similar to *Labrum*, this case involved a violent confrontation between two family members in which the alleged victim had armed himself at the outset of the confrontation and the defendant had raised a self-defense claim at trial, claiming that the alleged victim was actually the aggressor all along. If presented to the jury in a vacuum, Brother's decision to arm himself with a hammer before he even saw Meik and before any violence had begun would likely have seemed odd. "Left without explanation, the jury might have inferred" from this that Brother "intended to ambush" Meik. *Id*. ¶ 34 (quotation simplified).

¶41 Indeed, Meik actively sought to create just such an impression. At trial, he testified that Brother had brought the same hammer to three prior altercations and that, at two of these, he had "swung it" to "provoke" Meik into a fight. Additionally, in Meik's recounting of the February 25 incident, Brother "already had the hammer in his hand" when he left his SUV and then

"came straight" at Meik and swung without provocation. Brother's use of the hammer was thus key to Meik's self-defense claim.

¶42    Given the nature of this confrontation and the nature of the defense advanced by Meik at trial, the State was entitled to put on evidence of the "victim's state of mind," including the reason for "the victim's fear of the defendant." *Id.* ¶ 22. To repurpose *Labrum*, "without an understanding that [Brother] had reason to fear [Meik], the State would be unable to explain why" Brother grabbed the hammer out of his SUV "and would be unable to challenge effectively [Meik's] testimony that [Brother] was the aggressor and that [Meik] was merely defending himself." *Id*. ¶ 23 (quotation simplified).

¶43    The testimony in question did just that. This testimony showed that Brother was aware of Meik's history of being controlling toward Wife and of acting aggressively toward men that he thought were having extramarital relations with her. Because Brother also knew that Meik thought Brother was having an affair with Wife, Brother's awareness of these prior incidents helped explain why Brother decided to arm himself with the hammer before speaking with Meik in the parking lot. Indeed, when the prosecutor asked Brother if he had been aware of these events "prior to the incident" between them in the parking lot on February 25, Brother said he had been. The prosecutor then asked him, "Is that why you pulled out the hammer?", and Brother replied that it was.

¶44    Under *Labrum*, we thus conclude that these incidents were introduced for a proper non-propensity purpose and therefore did not violate the first step of the rule 404(b) analysis.

B.    Rule 402

¶45    Rule 402 "permits admission of only relevant evidence." *Balfour*, 2018 UT App 79, ¶ 28 (quotation simplified). And under

rule 401, evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Utah R. Evid. 401.

¶46 Again, the central issue in this case was who the aggressor was in the violent confrontation in the parking lot: Meik (the State's view) or Brother (the defense's view). As correctly noted by the district court, because this was a self-defense case, "the state[s] of mind of both" Meik and Brother were thus "at issue," and, as a result, evidence showing what Meik and Brother "individually believed" was "relevant to and probative of the issues."

¶47 As discussed above, the testimony in question went directly to the question of why Brother armed himself with a hammer, which would have had some tendency to make certain facts at issue more probable than they would have been without the evidence. This testimony was accordingly relevant.

C. Rule 403

¶48 This leaves the question of whether testimony about the prior acts satisfied the requirements of rule 403. Evidence may be excluded under rule 403 only where its probative value is "substantially outweighed" by the danger of "unfair prejudice." Utah R. Evid. 403. "Evidence of bad character or unrelated prior crimes is prejudicial because of the tendency of a fact finder to convict the accused because of bad character rather than because [the accused] is shown to be guilty of the offenses charged." *State v. Reed*, 2000 UT 68, ¶ 23, 8 P.3d 1025 (quotation simplified). Given the requirement that the risk of unfair prejudice must "substantially outweigh" the evidence's probative value, courts "indulge a presumption in favor of admissibility" in a rule 403 analysis. *Green*, 2023 UT 10, ¶ 78 (quotation simplified).

¶49 For largely the same reasons discussed above, we regard the probative value of this evidence as being high. The question of why Brother armed himself before he even saw Meik was squarely before the jury. During Brother's cross-examination, for example, Counsel focused on the perceived oddity of that decision, suggesting that it showed that Brother was the aggressor. Brother's awareness of Meik's past behavior was thus probative because it showed that he was afraid that Meik was going to attack him. Without this testimony, the State would have been impaired in its ability to effectively respond to Meik's self-defense claim.

¶50 With respect to the potential for unfair prejudice, Meik points to *State v. Reed*, wherein our supreme court expressed concern about the heightened potential for unfair prejudice that "may result from introduction of prior criminal acts committed against a number of unrelated victims," as opposed to cases in which the evidence involved multiple acts against a single victim. 2000 UT 68, ¶ 31. Meik then analogizes *Reed* to his case, noting that the testimony at issue here also involved acts of aggression toward multiple people.

¶51 Even accounting for this, we do not believe the risk of unfair prejudice substantially outweighed the evidence's probative value. In the context of this case and the competing claims that were before the jury, the probative value of Brother's testimony was high. And on the other end of the balancing, the danger that the jury would draw an unfair inference from this evidence was, in our view, mitigated by two factors.

¶52 First, the past acts in question were similar to Brother's account of what was prompting his conflict with Meik. As noted, the past incidents involved Meik acting aggressively because of his control and jealousy issues relating to Wife, and Brother was now claiming that these very same issues were prompting Meik to act aggressively toward him. In *Green*, our supreme court recently held that a district court did not abuse its discretion when

it concluded that similarities between past acts and the acts in question would "reduce[] the tendency for the jury to decide upon an improper basis," because it would be "unlikely that a jury would find the evidence in one . . . case to be lacking but find the evidence in another . . . case compelling enough to deliver a verdict on an improper basis." 2023 UT 10, ¶¶ 77–78.

¶53 Second, and perhaps more importantly, the risk of unfair prejudice in this case was also mitigated by the ways in which the State did and did not use this evidence at trial. While questioning Brother about these incidents, the prosecutor consistently keyed in on Brother's awareness of the past incidents, and those questions culminated in the prosecutor asking whether that awareness motivated Brother to grab the hammer. The prosecutor's questions included:

- "Were you aware of any times that [Meik] threatened or was violent toward anyone else that you knew or heard of?"

- "[W]ere you aware of any violence involving [Meik] and [Wife] . . . prior to this assault?"

- "Tell us what you were aware of."

- "[B]efore this incident occurred, were you aware of whether or not [Meik] had been violent toward [Wife]?"

- "Were you aware of any interaction between [Meik] and [Neighbor]?"

- "Did [Meik] ever indicate to you that he did anything toward [Neighbor]?"

- "[S]o you were aware of the incident with [Neighbor] prior to the assault; correct? . . . And the incident or incidents with [Wife] and [Meik]; correct? . . . And you were aware

of threats that were made to you by [Meik] prior to the incident; correct? . . . *Is that why you pulled out the hammer?*" (Emphasis added.)

¶54 The prosecutor's closing argument was similarly focused. After summarizing the prior bad acts evidence, the prosecutor emphasized that Brother "was aware of all these things" and that he was also "aware" that "Meik's violent nature" was tied to Meik's belief that "numerous people" were "having sex with his wife." The prosecutor then argued that after Brother pulled into the parking lot on February 25, he thought to grab the hammer because he believed "there might be a threat here." While the prosecutor's reference to "Meik's violent nature" was unfortunate and arguably improper, we ultimately agree with the State that the prosecutor's presentation as a whole wasn't focused on Meik's violent tendencies in the abstract; rather, the prosecutor consistently linked these past incidents to Brother's personal awareness of Meik's aggressive reaction to suspicions of infidelity, which was the very thing at issue in this case.

¶55 In short, this was highly probative evidence, and the danger of unfair prejudice was reduced by both the similarities to this case and the prosecutor's (mostly) targeted use of the evidence. Given this, we conclude the probative value was not substantially outweighed by the danger of unfair prejudice.

¶56 From there, and returning to the broader question, we thus also conclude that Counsel did not perform deficiently. Since the testimony in question satisfied each part of the rule 404(b) inquiry, we conclude that the proposed objection under that rule would have been futile. As a result, Counsel could reasonably forgo making it.

### II. Failure to Request Notice of Rule 404(b) Evidence

¶57 "On request by a defendant," the State is required to give pretrial notice to a defendant of potential 404(b) evidence. Utah R.

Evid. 404(b)(2). Meik argues that Counsel provided ineffective assistance by not requesting such notice. We need not decide whether Counsel performed deficiently. This is so because, even if this was deficient performance, Meik has not shown that he was prejudiced.[7]

¶58    Meik "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bonds*, 2023 UT 1, ¶ 53 (quotation simplified). And when evaluating this, "we assess counterfactual[] scenarios—that is, what would have happened but for the ineffective assistance." *Ross v. State*, 2019 UT 48, ¶ 76, 448 P.3d 1203.

¶59    The apparent reason for rule 404(b)'s pretrial notice rule is to give the defendant a fair chance to prepare a response to this particular kind of evidence. But Meik has not persuaded us that, with advance notice, there is anything different that Counsel could or should have done that would have likely led to a more favorable outcome. Meik initially asserts that, with advance notice, Counsel "could have moved to exclude" the evidence before trial. But we've concluded above that much of the evidence in question was admissible, so with respect to that evidence, such an objection would have failed. And, as we discuss below, the remaining evidence at issue in Meik's 404(b) claim (namely, the evidence regarding the protective orders) was non-prejudicial, so it also provides no basis for reversal with respect to the lack of notice claim.

¶60    Meik also argues that pretrial notice would have allowed Counsel to better defend against this evidence at trial. But Counsel's approach at trial already showed an awareness of these

---

7. In light of this, we also need not weigh in on the State's assertion that, although no such request appears in the record, Meik has failed to establish that Counsel did not receive notice of the 404(b) evidence through some other means.

general issues. For example, in his opening statement, Counsel frankly acknowledged that Meik thought that Brother "was sleeping with his wife" and that this "was certainly hard on" Meik. And Counsel likewise already mounted a defense to the related claims. For example, Counsel repeatedly attempted to cast doubt on Brother's claim that he was afraid of Meik (and, by extension, Brother's claim that Meik was the aggressor in this confrontation). This included questioning Brother about prior threatening messages that he had sent Meik, as well as arguing that Brother's professed behavior was inconsistent with fear.

¶61 Meik has not explained what more Counsel could have done to respond to these claims if he had received pretrial notice. Because of this, Meik has not persuaded us that there's any reasonable probability that the outcome at trial would have been different without the alleged deficient performance. This claim accordingly fails.

### III. Failure to Object to Potential Hearsay and to Remaining Other Acts Evidence

¶62 Meik argues that Counsel was ineffective for not objecting to Brother's testimony that Wife had told him that Meik was "mean," "jealous," and "tried to keep her from leaving." In Meik's view, these statements were inadmissible hearsay. In response, the State argues that the statements were not hearsay because they were offered to show Brother's state of mind going into the confrontation. We need not decide whether Counsel performed deficiently by not objecting on this basis, however, because we conclude that Meik was not prejudiced by the admission of this evidence. For similar reasons, we also conclude that Meik was not prejudiced by Counsel's failure to file a motion to suppress the testimony about his past protective orders.

¶63 The crux of Meik's prejudice argument for both issues is his assertion that this case presents a "classic credibility contest, where the jury had to choose who to believe." Meik argues that,

in such cases, even small changes to the evidentiary picture can tip the scales. *See State v. J.A.L.*, 2011 UT 27, ¶ 42, 262 P.3d 1. In Meik's view, the testimony in question here did just that.

¶64 We disagree with Meik's assessment of the potential prejudice stemming from the testimony in question, however, and we do so for several reasons.

¶65 First, this case did not present the jury with a "classic credibility contest" between just two witnesses. At trial, Brother testified at length about the lead-up to the confrontation and about how Meik attacked him during it. The State also presented testimony from several eyewitnesses, and those eyewitnesses largely corroborated Brother's account of the confrontation. For example, Meik claimed that he exited his truck before Brother had even parked, but Brother, Mother, and Daughter all said that Brother was the first one to exit a vehicle. As a further example, Meik claimed that while fending off several unprovoked blows from Brother, he went back to his truck, opened the passenger's side door, and grabbed his knife. But Mother and Daughter both testified that they never saw Meik return to his truck or open the passenger's side door, thereby undermining this part of Meik's story too. Thus, to the extent that this case did present the jury with a "credibility contest," it wasn't a credibility contest between just Meik and Brother. Rather, it was a credibility contest with Meik on one side and Brother on the other, but Brother had corroborative testimony on several pieces of his story from unrelated eyewitnesses.

¶66 Second, Meik's credibility was also undermined by several internal inconsistencies within his own account. For example, Meik offered inconsistent explanations for why he chose to go to Brother's house. In his direct examination, Meik said that after going to Grantsville for unrelated reasons, he decided to see if Brother was home so that he could discuss some money that he was owed, as well as his suspicion that Brother was having an affair with Wife. On cross-examination, however, he testified that

he actually went to Brother's house after Brother was "stalking [him] around Grantsville" and he couldn't "shake" him. When asked to explain the discrepancy in these two stories, Meik said, "I guess I missed that detail."

¶67    Meik also gave inconsistent accounts of what happened in the later stages of the confrontation. In his direct examination, he testified that he "chased" Brother and that Brother was "running" and "swinging the hammer the whole way," but he then claimed in cross-examination that Brother actually "didn't run" and "never ran." On this, the various witnesses agreed with Meik's initial account (as opposed to Meik's account from cross-examination)—Resident 2, Mother, and Daughter all described Brother as running away from Meik, while Resident 1 said that Meik was "chasing" Brother. And none of the witnesses saw anything compatible with Brother walking "backwards swinging the hammer."

¶68    Meik also gave inconsistent accounts of why he pursued Brother through the parking lot at all. Meik initially claimed that he was trying to disarm Brother. But he then claimed that he actually chased Brother in order to get him to "lay on [his] back" for first-aid purposes.

¶69    Third, the nature of the pursuit across the parking lot undermines Meik's claim about who played what role in this confrontation. Meik, Brother, and four other witnesses all agreed that after Brother tried to break things off, Meik pursued him through the parking lot. By Meik's own admission, he then "tackled" Brother and held him to the ground for several minutes, despite Brother's repeated entreaties to "let [him] go." Mother and Daughter likewise both testified that Meik was on top of Brother during that exchange. And during the moments in which Meik was on top of Brother, three witnesses—Resident 1, Resident 2, and Employee—all said that they heard one of the men shouting that he thought the other man was trying to stab him, which, in

context, would have been a real-time indicator that Brother thought that Meik was still attacking him with his knife.

¶70 This case largely turned on the question of who the aggressor was. Meik's decision to prevent Brother from disengaging and instead run after Brother and tackle him in the parking lot suggests that it was Meik who desired a violent confrontation, not Brother. And although Meik claimed that he did so to either disarm Brother or instead render first aid, our analysis of prejudice within the ineffective assistance context requires us to assess the probabilities of how the jury viewed the testimony in question. Here, we think it more likely that Meik's decision to chase after his bleeding Brother and then tackle him would have been viewed by the jury as a sign that Meik was the aggressor all along, particularly given Brother's subsequent shouts from the ground about Meik attacking him with the knife.

¶71 Finally, the two brothers sustained markedly different wounds from the confrontation. Brother sustained a significant stab wound to his stomach that caused him to be airlifted to a hospital, where he stayed for seven days and received numerous surgeries. By contrast, Meik sustained only a "laceration on the top of his head" and "a small laceration on his face"—wounds that seem inconsistent with Meik's claim that, at the outset of the confrontation, Brother had taken the "biggest swing he could" and hit him in the head with a hammer, as well his claim that Brother had then followed Meik back to the truck while continuously "swinging at" him with the hammer.

¶72 In short, Meik asks us to view this as a credibility contest between the differing accounts given by Meik and Brother. But Brother's account was in some measure corroborated by other witnesses, Meik's account was undermined by his own inconsistencies, Meik's claim that Brother was the aggressor was at odds with his pursuit of Brother across the parking lot, and the nature of the injuries was more consistent with Brother's account than Meik's. We therefore don't believe there's a reasonable

probability that the jury would have reached a more favorable verdict if it had not heard the evidence about either the alleged hearsay or the protective orders. And we thus conclude that Meik was not prejudiced by any error relating to that evidence.

## CONCLUSION

¶73    Meik has raised several claims of ineffective assistance. But after reviewing those claims and the evidence in this case, we see no basis for concluding that there was any prejudicial error. His conviction is accordingly affirmed.

———————