2025 UT App 65

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
SPENCER GREENWAY,
Appellant.

Opinion
No. 20221105-CA
Filed May 8, 2025

Third District Court, Salt Lake Department
The Honorable Kara Pettit
No. 201901182

Emily Adams and Rachel Phillips Ainscough,
Attorneys for Appellant

Derek E. Brown and Michael Palumbo,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES RYAN M. HARRIS and RYAN D. TENNEY concurred.

ORME, Judge:

¶1     Spencer Greenway appeals his conviction for murder, arguing that his defense counsel (Counsel) provided ineffective assistance in failing to object to the admission of certain text messages and phone calls under rule 404(b) of the Utah Rules of Evidence.[1] But Greenway cannot show that Counsel performed deficiently with respect to the text messages or that any alleged

---

1. Greenway does not differentiate his claim between the two attorneys who represented him at trial, so we refer to them collectively as "Counsel."

deficiency prejudiced him as concerns the phone calls. Accordingly, we affirm.

## BACKGROUND[2]

¶2    Spencer Greenway and his girlfriend (Girlfriend) had a "rollercoaster" relationship. Over time, Girlfriend became close with Spencer's friend, Aaron,[3] to the extent that when Aaron went to prison, Girlfriend wrote him letters and visited him, often venting about her relationship with Greenway. Girlfriend and Aaron continued their friendship after he was released from prison. When Greenway found out about this, and suspecting Girlfriend was cheating on him with Aaron, he became upset and threatened to leave her.

¶3    In January 2020, after an especially tumultuous few days, Girlfriend, who was newly pregnant, asked Greenway to leave the house where they lived with a roommate. Greenway started packing his things, and Girlfriend went to sleep. While Girlfriend slept, Greenway took her cell phone and discovered text messages between her and Aaron—some of which were sexually explicit and revealed that Girlfriend had seen Aaron the day before. Greenway began screaming at Girlfriend, saying he "was going to beat [Aaron's] ass." Greenway's friend—who was dating the roommate—heard Greenway yell at Girlfriend about "having an affair with" Aaron and then storm out of the house. Greenway took Girlfriend's phone with him and took off in the roommate's car to confront Aaron. He parked down the street from Aaron's house.

---

2. "We recite the facts from the record in the light most favorable to the jury's verdict." *State v. Torres-Orellana*, 2024 UT 46, n.2, 562 P.3d 706 (quotation simplified).

3. A pseudonym.

¶4 Aaron and his friend had just arrived home, and while Aaron went to the garage, his friend went inside. But realizing she might have left something in her car, the friend came back outside. Hearing "a tinging noise" and sounds of a "wrestle," she looked around her car to see Aaron and Greenway fighting. She recalled seeing Greenway hitting Aaron's head with what looked like a baseball bat and hearing one of the men say, "A homey shouldn't do that with somebody's girlfriend." The fight spilled onto the street, with Greenway and Aaron going "back and forth." Aaron's friend saw Greenway point a knife at Aaron and then run up the street to his car. She then rushed Aaron—who was "bleeding out"—to the hospital. As she was trying to help Aaron into a wheelchair, he fell and hit his head on a brick wall, losing consciousness. Aaron later died of his injuries, which included several stab wounds and significant head trauma.

¶5 Greenway returned home with a black eye and blood on his arms. Greenway told his friend he "just had a confrontation" with Aaron. He said that Aaron hit him with a wrench so he hit Aaron in the head with "a bat with barbed wire." Greenway also showed his friend a knife with blood on it. He told Girlfriend a similar story, saying Aaron had hit him with a wrench "so he had stabbed him." Greenway also showed her the knife he had used.

¶6 Later that day, Greenway was arrested. He had a knife on his belt and blood on his pants. In his interview with police, Greenway expressed that he was "angry" and "wanted to confront" Aaron about Girlfriend. He admitted he had called Aaron twice before arriving at his house "in a rage." Greenway stated that Aaron had hit him in the back with a "wrench" or "some kind of tool," knocking him down. Greenway said Aaron had threatened to shoot him, so he grabbed the knife and "lunged forward." He admitted to "poking" Aaron with the knife, but only once, "in between his arm and chest" in his "armpit area." Greenway initially denied bringing a bat with him, saying first that he had only "a little . . . piece of wood," before finally

admitting he had a bat wrapped in barbed wire with him during the fight. Greenway also admitted to telling Girlfriend that he "ended up stabbing [Aaron] by accident."

¶7 Greenway was charged with murder. Prior to trial, the State filed a motion in limine seeking to introduce text messages sent prior to the murder between Greenway and Girlfriend and between Greenway and another friend, as well as recorded phone calls between Greenway and Girlfriend while he was in jail awaiting trial for the murder. The State sought to use this evidence to show Greenway's intent and motive to murder Aaron under rule 404(b) of the Utah Rules of Evidence. Counsel stipulated to the admission of all the messages and calls the State sought to introduce.

¶8 Many of these exhibits were introduced during Girlfriend's testimony about her "toxic" relationship with Greenway. The State introduced a slew of text messages between Greenway and Girlfriend from months before the murder. In one exchange, Girlfriend mentioned that she was with someone who shared Aaron's first name. Greenway responded, "Better not be [Aaron]." Girlfriend reminded him, "Babe he's in jail . . . . Prison." In another text exchange, Greenway told Girlfriend that if she ever saw or associated with Aaron again, he would "fucking kill him. No joke." In other messages, Greenway talked about how he had "slashed four tires in a week and smashed the driver's side window" of someone else's car and how he had "hunted [the owner] down with a bat while he hid inside like a bitch."

¶9 Girlfriend testified that she had been arguing "off and on" with Greenway in the days leading up to the murder. She read messages between them from the period in which Greenway threatened to leave her "after seeing [Aaron's] love letters to" her. He said, "I'm starting to believe you really do plan on cheating on me with him and you are his ride or die. But with me it's all a lie." In later messages, after being unable to reach Girlfriend,

Greenway accused her of doing "something shady" and threatened to "destroy[]" her room, "cut up all [her] clothes," and "smash [her] laptop." He told Girlfriend that if she did not come home, she would "never see the dogs again." He also told her, "Get that baby aborted or I'll do it myself." And he threatened to kill himself, kill Girlfriend, and "murder the whole fucking household" if Girlfriend did not come home.

¶10    The State also introduced text messages and records of phone calls made from Girlfriend's phone to Aaron on the night of the murder. Girlfriend testified that she did not have her phone with her at the time the calls were made. Aaron's friend testified that she had been driving Aaron around while he was "arguing with somebody on the phone" saying, "If you're going to talk this up, come at me bro." Greenway admitted to police that he had called Aaron from Girlfriend's phone. A text message sent from Girlfriend's phone to Aaron a few minutes later read, "Where you at, bitch? I'm here."

¶11    The State also introduced audio of phone calls between Girlfriend and Greenway recorded while he was in jail awaiting trial. In one conversation, Greenway stated he "might have to kill" Girlfriend's OBGYN if the doctor was male. Greenway also threatened to kill the roommate. And he stated that he was "in a rage" "like no other" on the night of the murder.

¶12    The investigating detective testified about his interview with Greenway. The detective testified that while Greenway had other markings from the fight, he had only "a couple of scratches on his upper back," which did not corroborate Greenway's story that Aaron had hit him on the back with a wrench or some other tool, initiating the fight. As part of the detective's testimony, the State also introduced text messages between Greenway and a friend from about a month before the murder in which Greenway said, "I'll do some dirty work for you, bro," and, "I got crow bars. I got some shit to do damage" to other people's cars. Greenway

also sent photos of a baseball bat wrapped in barbed wire to his friend. On cross-examination, the detective acknowledged that this conversation was "punctuated with things like LOL and emojis." He also testified that he did not investigate these messages more fully and was "not really sure" that they were anything other than "trash-talking bluster."

¶13 The defense did not call any witnesses. In closing argument, Counsel acknowledged that Greenway had "caused the death of" Aaron but argued that Greenway had been justified in using deadly force. Counsel mentioned the "long series of text messages that Mr. Greenway sent that contain all kinds of just outrageous threats," mentioning specifically Greenway's threats to "wipe out [Girlfriend]'s family," "assault his friend," "cut up [Girlfriend's] clothing" and destroy her computer, kill himself, and kill Girlfriend's OBGYN. But Counsel stated that "[a]ll those things are things that never happened." Counsel argued to the jury that these messages simply showed that Greenway was "prone to saying stupid, outrageous things and not following through on them."

¶14 A special verdict form allowed the jury to find Greenway guilty of murder under one or more alternative theories. While the jury did not find that Greenway "intentionally or knowingly" caused Aaron's death, it found he was guilty of murder by both "intending to cause serious bodily injury to another" and "acting under circumstances evidencing a depraved indifference to human life" by "knowingly engag[ing] in conduct which created a grave risk of death to another." The jury also found that neither perfect nor imperfect self-defense applied.

ISSUE AND STANDARD OF REVIEW

¶15 On appeal, Greenway argues that Counsel was ineffective in stipulating to, rather than objecting to, the State's admission of several series of text messages and several phone calls. "When a

claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Meik*, 2024 UT App 46, ¶ 30, 547 P.3d 878 (quotation simplified), *cert. denied*, 554 P.3d 923 (Utah 2024).

ANALYSIS

¶16    To prevail on his ineffective assistance claim, Greenway "must show (1) that Counsel's performance was deficient and (2) that the deficient performance prejudiced the defense." *State v. Meik*, 2024 UT App 46, ¶ 31, 547 P.3d 878 (quotation simplified), *cert. denied*, 554 P.3d 923 (Utah 2024). Greenway must establish both prongs, and "if either is lacking, the claim fails and this court need not address the other." *Id.* (quotation simplified). *See Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182 ("Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [an appellant's] claims under either prong.").

¶17    To establish deficient performance, Greenway "must rebut a strong presumption that Counsel's conduct falls within the wide range of reasonable professional assistance; that is, he must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *State v. Ringstad*, 2018 UT App 66, ¶ 41, 424 P.3d 1052 (quotation simplified). "The focus of this inquiry is reasonableness, and we judge the reasonableness of Counsel's challenged conduct, viewed as of the time of Counsel's conduct." *Meik*, 2024 UT App 46, ¶ 32 (quotation simplified).

¶18    To establish prejudice, Greenway "must show that there is a reasonable probability that, but for Counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* ¶ 33 (quotation simplified). "A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Id.* (quotation simplified).

¶19　In Greenway's view, Counsel was ineffective in failing to object to the admission of the text messages and phone calls under rule 404(b) of the Utah Rules of Evidence. The messages and phone calls fall into three categories: text messages sent months before the murder, text messages sent in the days leading up to the murder, and phone calls recorded while Greenway was in jail awaiting trial for the murder. Greenway's ineffective assistance claim fails because he cannot show both prongs of the ineffective assistance test with respect to any category.

### I. Text Messages Sent Months Before the Murder

¶20　First, Greenway argues Counsel should have objected to the admission of a series of text messages between him and Girlfriend and a text exchange between him and a friend that happened months before the murder. In the exchanges with Girlfriend, Greenway repeatedly expressed paranoia about Girlfriend cheating on him with Aaron; threatened to kill Aaron, Girlfriend, and himself; and reminded Girlfriend that he had previously "hunted [someone] down with a bat." And in his exchange with a friend, Greenway offered to "do some dirty work" on the friend's behalf and sent pictures of a bat wrapped in barbed wire. Greenway argues Counsel was ineffective in failing to object to these messages under rule 404(b) of the Utah Rules of Evidence. We disagree.

¶21　"It is fundamental in our law that a person can be convicted only for acts committed, and not because of general character or a proclivity to commit bad acts." *State v. Lane*, 2019 UT App 86, ¶ 17, 444 P.3d 553 (quotation simplified). "This concept is articulated in rule 404(b) of the Utah Rules of Evidence," *id.*, which states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character," Utah

R. Evid. 404(b)(1). But "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2). To be admissible under this exception, "the evidence (1) must be offered for a genuine, noncharacter purpose, (2) must be relevant to that noncharacter purpose, and (3) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice." *State v. Von Niederhausern*, 2018 UT App 149, ¶ 17, 427 P.3d 1277 (quotation simplified).

¶22 Whether or not entirely accurate, Counsel could have reasonably concluded that these text messages were admissible under each part of this inquiry.

A.    Noncharacter Purpose

¶23    "The threshold 404(b) question is whether the evidence has a plausible, avowed purpose beyond the propensity purpose that the rule deems improper." *State v. Meik*, 2024 UT App 46, ¶ 37, 547 P.3d 878 (quotation simplified), *cert. denied*, 554 P.3d 923 (Utah 2024). "If it does then the evidence is presumptively admissible (subject to rule 402 and 403 analysis)." *Id.* (quotation simplified). "The possibility of an improper inference is not enough to dictate the exclusion of the texts under rule 404(b)." *State v. Weaver*, 2023 UT App 154, ¶ 34, 541 P.3d 958 (quotation simplified). "Indeed, we have said that rule 404(b) is fundamentally an inclusionary rule, and evidence of prior bad acts is only excluded where the *sole* reason it is being offered is to prove bad character or to show that a person acted in conformity with that character." *State v. Balfour*, 2018 UT App 79, ¶ 27, 418 P.3d 79 (emphasis in original, quotation otherwise simplified), *cert. denied*, 429 P.3d 465 (Utah 2018).

¶24    Here, the State sought to use the text messages with Girlfriend to show Greenway's motive and intent—both of which are expressly enumerated as permissible purposes in rule

404(b)(2). Greenway concedes that at least part of one of these text exchanges in which he threatened to "fucking kill" Aaron was admissible to show his intent. And taken together, these messages show that Greenway and Girlfriend were arguing about Aaron for months leading up to the murder. The messages show Greenway's ongoing paranoia about Girlfriend having an affair with Aaron—providing motive for Greenway to go to Aaron's house on the night of the murder. And Counsel could also have reasonably concluded that the messages exchanged with Greenway's friend show that Greenway set out to attack Aaron with a unique weapon—the baseball bat wrapped in barbed wire—and that his past mention of this dangerous weapon also bore on his intent in confronting Aaron. In sum, reasonable counsel could have concluded that these messages were admissible for these noncharacter purposes.

B.      Relevance

¶25     Such noncharacter evidence must also be relevant to be admissible, *see* Utah R. Evid. 402, meaning "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action," *id.* R. 401. These messages made it more probable that Greenway went to Aaron's house, armed with a baseball bat and a knife, with the motive and intent to fight him—if not to kill him—and that Greenway was the initial aggressor in the fight. Thus, reasonable counsel could also conclude that these messages met the "low bar" for relevance. *State v. Von Niederhausern*, 2018 UT App 149, ¶ 23, 427 P.3d 1277 (quotation simplified).

C.      Probative Value and Risk of Unfair Prejudice

¶26     Finally, the probative value of the evidence must not be substantially outweighed by a danger of *unfair* prejudice as addressed in rule 403. "For purposes of this test, the probative value of evidence is judged by the strength of the evidence and its ability to make the existence of a consequential fact either more or

less probable and the proponent's need for the evidence." *State v. Simpson*, 2025 UT App 32, ¶ 35 (quotation simplified), *petition for cert. filed*, Apr. 1, 2025 (No. 20250329). "And evidence is unfairly prejudicial when it has an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* (quotation simplified). "Given the requirement that the risk of unfair prejudice must substantially outweigh the evidence's probative value, courts indulge a strong presumption in favor of admissibility in a rule 403 analysis." *State v. Meik*, 2024 UT App 46, ¶ 48, 547 P.3d 878 (quotation simplified), *cert. denied*, 554 P.3d 923 (Utah 2024).

¶27 The text messages were probative of Greenway's motive and intent in going to Aaron's house on the night of the murder. Greenway concedes that a threat he made against Aaron in at least one of the text exchanges with Girlfriend is admissible under rule 404(b). Thus, given the probative nature of these messages, Counsel could have reasonably assumed that the risk of unfair prejudice posed by the messages would not be sufficient to substantially outweigh their probative value.

¶28 In sum, reasonable counsel could conclude that the text messages sent months before the murder were admissible under rule 404(b), and Counsel therefore did not perform deficiently by failing to object.

## II. Text Messages Sent Days Before the Murder

¶29 Greenway also argues Counsel was ineffective in failing to object to the admission of several series of text messages between him and Girlfriend in the days leading up to the murder. In these messages, "after seeing [Aaron's] love letters to" her, Greenway expressed paranoia that Girlfriend would cheat on him, and he threatened to "destroy[]" her room, "cut up all [her] clothes," and "smash [her] laptop." He told her if she did not come home, she would "never see the dogs again." Greenway also threatened to harm himself; told Girlfriend, "Get that baby aborted or I'll do it

myself"; and told her that if she did not come home, he was "going to murder the whole fucking household."

¶30 Greenway contends that Counsel should have objected to these messages under rule 404(b) of the Utah Rules of Evidence. But even if this evidence was arguably inadmissible, Counsel was not deficient in stipulating to its admission.

¶31 Clearly, these messages were not flattering to Greenway. But in *State v. Isom*, 2015 UT App 160, 354 P.3d 791, *cert. denied*, 364 P.3d 48 (Utah 2015), we concluded that defense counsel who was facing "shocking" and "outrageous" testimony about the defendant's prior behavior did not perform deficiently in failing to object to the testimony and instead using it to impeach the witness and show how far-fetched the claims were. *Id.* ¶¶ 82–83, 85. And in *State v. Hunt*, 2024 UT App 180, 561 P.3d 1196, *petition for cert. filed*, Feb. 12, 2025 (No. 20250159), we concluded defense counsel's use of the defendant's prior felony convictions did not constitute deficient performance as it allowed counsel to reframe the evidence by "highlight[ing] that in each prior case, [the defendant] had accepted responsibility" and had behaved cooperatively during his prior incarceration. *Id.* ¶ 20. In both *Isom* and *Hunt*, we concluded that defense counsel had reasonably tried "to take the wind out of the sails" of such unflattering evidence. *Id.* ¶ 21 (quotation simplified). *See Isom*, 2015 UT App 160, ¶ 83.

¶32 Counsel took a similar tack here. While cross-examining Girlfriend, Counsel brought up the threats Greenway made in the text messages. Counsel asked Girlfriend, "He didn't do any of those things, did he?" Girlfriend replied, "No." In closing argument, Counsel again mentioned the "outrageous threats" Greenway made in the "long series of text messages" but highlighted that "all those things are things that never happened." Showing the hollow nature of Greenway's many threats was not unreasonable. And Counsel linked this pattern to

the fight with Aaron, suggesting that despite what Greenway had said, he did not show up at Aaron's house to follow through on any threats. Counsel reframed the evidence, highlighting how "Greenway is prone to saying stupid, outrageous things" but has a history of "not following through on them." This strategy was "[c]ertainly . . . deliberate" and not inadvertent as Counsel "stipulated to the admission" of all the State's exhibits. *State v. Ringstad*, 2018 UT App 66, ¶ 43, 424 P.3d 1052.

¶33    "We give wide latitude to trial counsel to make tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." *State v. Bedell*, 2014 UT 1, ¶ 23, 322 P.3d 697 (quotation simplified). Given the volume of text messages and their inflammatory content, it was reasonable for Counsel to decide to use the messages "strategically . . . in an attempt to spin the narrative to [Greenway's] advantage." *Hunt*, 2024 UT App 180, ¶ 19. The fact that this strategy "did not produce the expected result does not constitute ineffectiveness of counsel." *Ringstad*, 2018 UT App 66, ¶ 41 (quotation simplified). Accordingly, Greenway cannot show that Counsel performed deficiently with regard to these text messages either.

### III. Phone Calls

¶34    Finally, Greenway argues Counsel should have objected to the admission of three recorded phone calls he made to Girlfriend while in jail awaiting trial. Greenway is concerned with portions of these phone calls in which he discussed his self-proclaimed "troubling relationship" with Girlfriend and made "jokes," as he put it, about killing her OBGYN and the roommate. But even if these calls were inadmissible under rule 404(b), and even if the failure to object constituted deficient performance—points we need not decide—Greenway cannot show that he was prejudiced thereby. *See Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182 (holding that appellate courts are free to dispose of an appellant's claim "under either prong" of the ineffective assistance test).

¶35 "When evaluating a prejudice claim in the ineffective assistance context, we assess counterfactual scenarios," *State v. Forbush*, 2024 UT App 11, ¶ 25, 544 P.3d 1 (quotation simplified), *cert. denied*, 550 P.3d 995 (Utah 2024), that is, "a hypothetical—an alternative universe in which the trial went off without the error," *State v. Ring*, 2018 UT 19, ¶ 36, 424 P.3d 845 (quotation simplified). "If we conclude that the result would have been the same absent the error, no prejudice has occurred." *Id.*

¶36 Here, in the "alternative universe" in which Counsel succeeded in excluding these phone calls, the jury would still have heard about other threats that Greenway made against Aaron and others in the months and days leading up to the murder. And even absent these phone calls, the other evidence against Greenway was overwhelming. *See State v. Courtney*, 2017 UT App 172, ¶ 31, 424 P.3d 198 (concluding that the defendant's ineffective assistance claim failed for lack of prejudice because "the evidence against [him] was overwhelming"). Greenway was overheard saying he "was going to beat [Aaron's] ass" before he went to Aaron's house. He admitted to police that he arrived at Aaron's house "in a rage." He also admitted to "poking" Aaron with a knife, leaving only the question of whether he did so justifiably. According to witness testimony, Greenway told others that Aaron had hit him first with a wrench or other tool, initiating the fight. But the investigating detective testified that Greenway had only "a couple of scratches on his upper back"—not markings consistent with being hit in the back by Aaron with a tool, as Greenway claimed. And Greenway's friend testified that Greenway told him after the murder that Greenway had gone to Aaron's house intending to fight.

¶37 Given this, "it would have made no difference if [Counsel] had successfully objected" to the phone calls, and Greenway therefore cannot show that he was prejudiced by the failure to do so. *Id.* ¶ 32.

CONCLUSION

¶38    Counsel was not deficient in failing to object to any of the series of text messages. And Greenway cannot show that the admission of the recorded jail phone calls prejudiced him. Thus, Greenway's claims of ineffective assistance of counsel fail.[4]

¶39    Affirmed.

———————

4. Greenway also argues that because all these text messages and phone calls were inadmissible under rule 404(b) of the Utah Rules of Evidence, Counsel should have also objected to their admissibility under rules 404(a) and 405. Because Greenway cannot show that Counsel was ineffective in failing to object under rule 404(b), we need not address this argument.