**2025 UT App 32**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
GABRIEL AARON SIMPSON,
Appellant.

Opinion
No. 20220452-CA
Filed March 6, 2025

Second District Court, Ogden Department
The Honorable Joseph M. Bean
No. 211900240

Emily Adams and Cherise Bacalski, Attorneys for
Appellant, assisted by law students Mitchell Roundy
and Elena Miller[1]

Derek E. Brown and Daniel W. Boyer,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1    Gabriel Simpson was charged with rape and object rape. Before trial, the State sought leave to present evidence of another sexual assault that Simpson had previously been convicted of committing. Simpson objected, arguing, in relevant part, that the evidence was inadmissible under rule 403 of the Utah Rules of Evidence. The district court overruled the objection and allowed

---

1. *See* Utah R. Jud. Admin. 14-807 (governing law student practice in the courts of Utah).

the State to present the evidence. At the close of trial, the jury convicted Simpson as charged.

¶2    Simpson now appeals, arguing that the district court abused its discretion in concluding that the evidence was admissible under rule 403. For the reasons set forth below, we disagree and therefore affirm Simpson's convictions.

BACKGROUND[2]

*Susan's Allegations*

¶3    Susan[3] and Simpson connected on a dating app in May 2020. At the time, Susan was 18 years old and still in high school. Simpson was a semi-professional football player who had attended some college. The two soon exchanged "small-talk questions" over another online messaging app. After three days of messaging each other, they met in person at Simpson's friend's apartment, where they watched a movie and had consensual sex.

¶4    The next evening, Simpson invited Susan to a party at the same apartment. When Susan arrived around 10:30 p.m., Simpson was there with six of his friends. Some of his friends were playing a video game, and Simpson was drinking alcohol. Simpson said hi to Susan, gave her a hug, and "greeted [her] like normal."

---

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Suhail*, 2023 UT App 15, n.1, 525 P.3d 550 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023).

3. The parties have referred to the victim with a pseudonym in their briefs, and we'll do the same.

¶5    When Susan sat on the ground, Simpson "pulled [her] in front of him" and started "grabbing and touching [her] body" and "trying to kiss" her. Susan was "uncomfortable," "tried to pull away," and "kept telling him . . . to stop." Simpson repeatedly asked Susan to go upstairs with him, but Susan "kept saying no." While this was occurring, one of Simpson's friends walked outside and came back inside with a handgun. This made Susan "nervous," so she decided to go upstairs with Simpson because she was "too scared to run out of the [apartment]."

¶6    Simpson took Susan to an upstairs bedroom. Once there, Simpson began "grabbing" Susan's breasts. He then pinned Susan on the floor so she couldn't "get away" and began penetrating her vagina with his fingers. Susan repeatedly told Simpson that he was hurting her and that she didn't want him to touch her in that manner. Simpson then began having sexual intercourse with Susan, and he continued doing so even though Susan "kept telling him [she] didn't want to and that it hurt." While this was occurring, Simpson was "holding" onto Susan's neck as if he was "choking" her, though "not hard." Susan eventually "gave up and just laid there." Susan later testified that she didn't think that Simpson was wearing a condom.

¶7    When Simpson eventually stopped, Susan went to the bathroom. Simpson followed her into the bathroom and said that he wouldn't leave until Susan urinated. Moments after Susan had finished urinating, a friend of Simpson's approached the door and, through a crack in the door, showed Simpson that he was on a video call with their coach. Simpson tried to introduce Susan to his coach, but Susan tried to stay out of the video.

¶8    Susan was soon able to leave the room and then the apartment. When Susan got to her car, she was "in shock at what happened" and "didn't want to go home." Instead, she picked up some friends who had been at another person's house and drove them home. During that drive, Susan "acted like everything was

fine" and "didn't mention" anything about what had just occurred.

¶9 The next day, Susan called one of the friends she had driven home the night before and told her "the basics" of what had happened with Simpson. Susan's friend encouraged Susan to "talk to somebody." Susan then contacted the police. Susan soon met with an officer (Officer) and told him that she wanted to pursue charges. During that meeting, Simpson was messaging Susan on the app that they had previously used to communicate. Susan blocked Simpson on that app on Officer's advice.

¶10 Over the ensuing months, there was minimal interaction between Simpson and Susan. Simpson sent Susan a text message a few weeks after their encounter, referring to her with a slightly altered version of her first name. About three months after that, Simpson commented on a picture Susan had posted on social media, suggesting that she now "look[ed] different."

¶11 About a month after Simpson commented on Susan's social media post, Officer reached out to Simpson, and the two later had a recorded interview by phone. During that interview, Officer told Simpson he was calling "about [a] sexual thing" and that he wanted to know whether Simpson "know[s] this person" or "dated this person." When Simpson asked who the person was, Officer provided Susan's first name, though Officer refused to provide Simpson with Susan's last name. Simpson said he didn't think he knew anyone by Susan's name except for one person he remembered from "seventh grade."

¶12 Officer later obtained a warrant for Simpson's DNA. While Officer was executing that warrant, Simpson told him that "he did know a girl" named Susan and that they had "hung out a couple of times." Simpson also gave Officer the names of two of his friends who had been at the party. But he otherwise refused to talk "about the sexual allegations."

¶13    Based on Susan's statements and other evidence collected in the investigation, the State charged Simpson with rape and object rape.[4]

*Motions Relating to Rules 404(b) and 403*

¶14    Before trial, the State gave notice of its intent to admit evidence of two prior incidents pursuant to rule 404(b) of the Utah Rules of Evidence.

¶15    The first prior incident involved one of Simpson's college classmates, Jane.[5] The State proffered as follows:

> On September 28, 2018, 20-year-old student [Jane] reported to police that she was raped by Gabriel Simpson, a fellow student in her English class at [college]. [Jane] reported that she originally went over to Simpson's dorm to work on an assignment when Simpson wanted [Jane] to take her pants off. [Jane] was clear she did not want to do anything sexual and repeatedly told Simpson no, but eventually gave in to his insistence to remove her pants. [Jane] stated Simpson then put his finger in her vagina despite her telling him "no" and that she needed to leave. [Jane] stated Simpson removed his pants and penetrated her vagina with [h]is penis while [Jane] put a pillow on her face because she did not want to look at him. [Jane] indicated she went to

---

4. The State originally charged Simpson with rape, object rape, and forcible sodomy. After the preliminary hearing, however, the district court granted the State's request to dismiss the forcible sodomy count without prejudice.

5. As we've done with Susan, we'll refer to the victims from the two other incidents with pseudonyms.

> a different place mentally while the rape happened. Afterwards, [Jane] indicated that Simpson said "we're not going to tell anybody about this." [Jane] also confronted Simpson about how what happened was not consensual via text messages that were turned over to the police. Simpson apologized and asked [Jane] not to ruin his future.

The State proffered that Simpson had been charged with rape as a result of Jane's allegations, provided a case number for that case, and noted that, "[a]s part of a plea resolution," Simpson had pleaded guilty to one count of "Forcible Sexual Abuse, a Third Degree Felony."

¶16 The second incident involved another classmate of Simpson's from college, Heather. The State proffered that Simpson had met Heather during freshman orientation and that they had become friends. The State proffered that while they were hanging out in Simpson's room one day in August 2018, Simpson had touched Heather's breasts, even though she had repeatedly said "no," and that he then inserted his fingers into her vagina, even though she again told him "no." Unlike the incident involving Jane, the State did not assert that this alleged incident resulted in criminal charges.

¶17 The State's rule 404(b) notice concluded by asserting that evidence of the two incidents would be admissible at trial to show Simpson's "motive, intent, plan, absence of mistake, or lack of accident for the conduct charged in this case, and would also be permissible under the doctrine of chances."

¶18 Simpson later filed a motion in limine to exclude the State's proposed evidence. In his motion, Simpson discussed "the four foundational requirements" of the doctrine of chances as it related to a rule 404(b) analysis. He conceded that there was a bona fide dispute, but he challenged the other three requirements—

similarity, independence, and frequency. From this, Simpson argued that the evidence was inadmissible under rule 404(b). Simpson also argued that the evidence should "be excluded under rule 403" because "the probative value of the alleged prior bad acts . . . is substantially outweighed by the danger of unfair prejudice."

¶19 After receiving an opposition memorandum from the State, the district court denied Simpson's motion in limine. Starting with Simpson's arguments relating to rule 404(b), the court reasoned that the evidence in question was relevant for "a non-character purpose"—i.e., "the credibility of the parties with regard to whether there was consent," particularly because, in the court's view, Simpson had already alleged (and intended to argue) that Susan "fabricated" her nonconsent.[6]

¶20 The court then addressed the doctrine of chances factors. In the court's view, the evidence was material because it countered Simpson's fabrication defense. The court also expressed its view that the incidents were similar because of the following commonalities:

---

6. When the court referred to Simpson's proposed fabrication defense, it seems that it was referring to a motion in limine that Simpson had previously filed, wherein Simpson sought to admit evidence that he and Susan "had consensual sexual relations" the night before Susan alleged that the non-consensual sexual encounter occurred. This motion relied on rule 412(b)(2) of the Utah Rules of Evidence, which allows admission of "evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent." Utah R. Evid. 412(b)(2). This apparently indicated to the district court that Simpson's defense at trial would include an argument that Susan fabricated her nonconsent.

- "All three victims were acquaintances of [D]efendant";

- "All three victims were in that demographic of 18 to 20 years of age";

- "All three victims went over to Defendant's house, or Defendant's residence, or wherever he was";

- "All three incidences did involve conduct where it escalated beyond the victims saying 'no', 'stop'";

- "All three victims indicated that the assault involved and usually began early on with Defendant attempting some sort of digital stimulation to the victims' vaginas"; and

- "A condom was not used during the two cases where intercourse or penetration was actually alleged."

Moving past similarity, the court concluded that the frequency factor was satisfied because "the probability that any given individual who might be accused of rape is low given the infrequent occurrence of false rape allegations," thus "[t]he probability that the same innocent person will be the object of multiple false accusations is extremely low." And more globally, the court also said that it was "persuaded by the fact that . . . all of the allegations took place within a 20-month period." From all this, the court held that the proposed evidence was admissible under rule 404(b) pursuant to the doctrine of chances.

¶21 The district court next addressed whether the evidence was admissible under rule 403. Assessing the probative value of the evidence, the court concluded that the evidence was "probative with regard to similarity," that it was "probative with regard to the interval," and that "it's definitely probative with regard to that allegation of fabrication." The court also referenced the State's "need" for the evidence, given the "he said/she said" nature of the case, as well as to allow the State to respond to any suggestion

that because "there was prior consensual sex the night before," Simpson was allowed to "have sex in the future" with Susan because he had "got[ten] consent once." In the court's view, there wasn't "any other alternative evidence that exist[ed] with regard[] to consent or fabrication," which it treated as "part of the 403 analysis."

¶22 Turning to the potential for unfair prejudice, the court acknowledged the difficulty of asking the jury not to "think of this in the terms of propensity," observing that "no matter how we say it, it's going to be prejudicial." But the court then expressed its view that with an appropriate limiting instruction, "the probative value would far outweigh the prejudicial effect on the jury." And the court expressed its intention to give such an instruction "during the trial" and again "with a written instruction to the jury after that." In light of all this, the court denied the motion and ruled that the evidence would be admissible.

¶23 The case ultimately proceeded to trial. After voir dire, the State informed the district court and Simpson that it no longer intended to present evidence of the alleged incident involving Heather, explaining that she had informed prosecutors that it would be "too traumatic" for her to testify and that she was "too stressed to come in and recount those . . . events with complete strangers." The next morning, on the first day of trial, Simpson renewed his motion in limine to exclude evidence of the incident involving Jane. Simpson now argued that, without the additional allegation involving Heather, the frequency analysis had changed so that the doctrine of chances no longer applied in the manner contemplated by the court in its earlier ruling. The district court declined to change its prior ruling, expressing its view that "even one circumstance still brings it within the [d]octrine of [c]hances."

¶24 Simpson's counsel then informed the court that he was lodging "an ongoing standing objection" to the State's prior bad acts evidence, rather than needing to "interrupt the [c]ourt" and

"perhaps confuse the jury during [the] trial," and the court agreed that Simpson had "been consistent enough with [his] objection that it [would] be a matter of record."

*Trial and Conviction*

¶25    In the State's opening statement, the prosecutor told the jury that as part of the State's case, it would hear from Jane, "who went to college with [Simpson] . . . back in 2018 and she will recount her experiences with Mr. Simpson." In the defense's opening statement, Simpson's counsel asserted, in part, that Susan fabricated the rape allegation that formed the basis for these charges because she thought Simpson was "clingy" and reminded her of a previous relationship.

¶26    The State called Susan and Officer as witnesses, and they testified to the events described above. The State also called several other witnesses, including the following:

- Susan's mother, who testified that on the night in question, Susan came home and got into bed with her, which Susan had "never done" before, and who further testified that Susan told her about the alleged rape the following day;

- a nurse, who testified about conducting a sexual assault exam on Susan; and

- a forensic scientist, who testified about performing a DNA analysis for the case, and "detect[ing] male DNA" on (1) a swab from Susan's vagina (which was not enough "to develop a profile") and (2) a swab from Susan's neck (which was "consistent with [Simpson's] DNA profile").

¶27    The State's final witness was Jane. Before Jane testified, the district court read the following instruction to the jury:

I'm going to give you another cautionary instruction. This is what is commonly referred to as prior bad acts evidence. You are about to hear from a witness whose [name is Jane] of another sexual assault committed by the defendant, Mr. Simpson. You are instructed that Mr. Simpson was charged with an offense involving [Jane] and ultimately pled to a lesser charge in that case.

You may use the evidence offered by [Jane] only to help you decide whether [Simpson] had non-consensual sexual intercourse with [Susan], the alleged victim in this case, and for other purposes listed below. The law does not allow you to convict Mr. Simpson or punish him simply because you believe that he . . . may have done things, even bad things not specifically charged as crimes in this case.

Evidence [of] other crimes or wrongs is not admissible to prove the character of a person in order to show that he acted in this case in conformity with that character. Evidence may be used or may be admissible for other purposes such as proof of motive, intent, plan, knowledge or absence of mistake or accident.

¶28    Jane then testified. Jane said that she met Simpson in 2018 during her first semester at college while they were working on a project together for their English class. She said that Simpson invited Jane over to his dorm room one night so that they could work on the project. According to Jane, she "wasn't feeling very sober" that night because she had smoked marijuana earlier with her roommates. Once she was inside Simpson's room, Jane said that Simpson told her that "he wanted to finger" her. Jane said that she told him no and that she just wanted to work on the assignment. According to Jane, Simpson then said that he

"want[ed] to play truth or dare" before they started working, after which he dared her to take her pants off or let him take them off for her. Jane testified that she again said "no," told Simpson that she was "seeing somebody," and "started listing off reasons why [she] didn't want to." Jane said that Simpson then grabbed at her pants, at which point she took them off herself. Jane said that Simpson asked her to touch his penis. According to Jane, she again said no, telling Simpson that she "didn't want to." Jane testified that Simpson then approached her, "moved [her] underwear[,] and put his fingers inside" her vagina. Jane said that Simpson then "started having sex with" her, and that while he did, she "put a pillow over [her] face so [she] wouldn't have to see what was going on." Jane said that Simpson did not wear a condom. She testified that before she left, Simpson made her "promise not to tell anybody." But Jane soon reported the incident to campus police.

¶29   After the State rested, the defense presented its case. Simpson's counsel called two friends that had been at the same party at which Susan claimed that Simpson raped her. The first friend testified that when Susan arrived, she and Simpson "hugged each other" and were acting "lovey-dovey with each other" before going upstairs. This friend said that when she left the party, Simpson and Susan were in the bathroom and others were standing outside the bathroom "talking about something on somebody's phone." She said that Susan had her clothes on but that she looked "nervous" or "embarrassed."

¶30   The second friend testified that when Susan arrived, he saw that she and Simpson were "holding hands" and "kissing" and that he eventually saw them go upstairs. This friend said that when Simpson and Susan later came back downstairs, it "seemed like they were getting along. They were still talking and laughing." He said that before Susan left, "[s]he gave [Simpson] a kiss bye and said, 'I love you.'"

¶31    After the defense rested, the district court read the final instructions to the jury. As part of these instructions, the court again read the limiting instruction that it had read before Jane's testimony, though the instruction was slightly modified this time to reflect that Jane had already testified.

¶32    In the State's closing argument, the prosecutor recounted the testimony from each witness, including Jane. Concerning Jane's testimony, he stated:

> Lastly you heard from [Jane]. And you're specifically instructed obviously not to consider a negative character inference related to that, and you should read through that instruction and only use the evidence for its intended purpose.
>
> But ultimately she told you a story very—of what happened to her that was very similar to what you heard from [Susan]. That she said "no." She provided reasons why they shouldn't engage in this conduct or why they couldn't engage in this conduct, and the defendant kept going. The defendant then moved to digital penetration with his fingers, and ultimately penetration with his penis into [Jane's] vagina. And she talked about the negative impacts this has had on her life as well.
>
> And you ultimately have to ask yourself what are the odds that two completely independent women would come up with almost an identical story. Both of them knew nothing about the other.

In the defense's closing argument, Simpson's counsel argued that Susan fabricated the rape allegation because she thought Simpson was "clingy" and reminded her of a previous relationship.

¶33 The jury convicted Simpson of both rape and object rape. Simpson now appeals.

ISSUE AND STANDARD OF REVIEW

¶34 Simpson raises one issue on appeal—namely, he argues that the district court should have granted his motion to exclude Jane's allegation pursuant to rule 403 of the Utah Rules of Evidence.[7] As our supreme court has explained,

> The appropriate standard of review for a district court's decision to admit or exclude evidence is abuse of discretion. A district court abuses its discretion when it admits or excludes evidence under the wrong legal standard. Whether the district court applied the proper legal standard in assessing the admissibility of evidence is a question of law that we review for correctness. If the district court applies the correct legal standard, it abuses its discretion only when its decision to admit or exclude evidence is beyond the limits of reasonability.

*State v. Green*, 2023 UT 10, ¶ 43, 532 P.3d 930 (quotation simplified).

ANALYSIS

¶35 Under rule 403 of the Utah Rules of Evidence, a district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."

---

7. Simpson does not separately challenge the district court's conclusion that the testimony was admissible pursuant to rule 404(b) of the Utah Rules of Evidence.

Utah R. Evid. 403. For purposes of this test, the "probative value of evidence is judged by the strength of the evidence and its ability to make the existence of a consequential fact either more or less probable and the proponent's need for the evidence." *Anderson-Wallace v. Rusk*, 2021 UT App 10, ¶ 19, 482 P.3d 822 (quotation simplified). And "evidence is unfairly prejudicial when it has an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Smith*, 2019 UT App 141, ¶ 35, 449 P.3d 971 (quotation simplified).[8]

¶36 By structural design, rule 403 puts its thumb on the scale in two particular respects, both of which matter to our resolution of this appeal.

¶37 First, as a textual matter, the rule "imposes the heavy burden not only to show that the risk of unfair prejudice is greater than the probative value, but that it *substantially* outweighs the probative value." *Id.* (emphasis added, quotation otherwise simplified). In this sense, rule 403 is "an inclusionary rule," *id.* (quotation simplified), and it requires courts to "indulge a presumption in favor of admissibility." *State v. Green*, 2023 UT 10, ¶ 78, 532 P.3d 930 (quotation simplified); *see also State v. Thornton*, 2017 UT 9, ¶ 58, 391 P.3d 1016 (explaining that once evidence

---

8. As indicated, Simpson also argued below that the testimony was inadmissible under rule 404(b), and some of our analysis of the rule 403 issue does indeed incorporate portions of the court's rule 404(b) determination. This overlap makes conceptual sense given the overlap between the two rules. *See State v. Green*, 2023 UT 10, ¶ 63, 532 P.3d 930 ("Evidence of prior bad acts must clear several evidentiary hurdles before admission—rules 404(b), 402, and 403." (quotation simplified)). Indeed, for prior bad acts evidence to be admissible, a court must determine that it "(1) is relevant to, (2) a proper, non-character purpose, and (3) does not pose a danger for unfair prejudice that substantially outweighs its probative value." *Id.* ¶ 64 (quotation simplified).

overcomes rule 404(b), it "is presumptively admissible" though still "subject to rule 402 and 403 analysis").

¶38 Second, when conducting the rule 403 balancing, a district court has "considerable freedom" to apply the rule "to the facts" of the case. *State v. Beverly*, 2018 UT 60, ¶ 56, 435 P.3d 160 (quotation simplified). This is so because district courts "have wide discretion in determining relevance, probative value, and prejudice." *Id.* (quotation simplified); *see also Francis v. National DME*, 2015 UT App 119, ¶ 34, 350 P.3d 615 ("The trial court is granted broad discretion when weighing the probative value of evidence against the reasons for exclusion enumerated in rule 403." (quotation simplified)). This deference is also "appropriate because the trial court is in the best position to make evidentiary rulings as they arise because it can review, among other things, the claims and the evidence already admitted or proffered." *Francis*, 2015 UT App 119, ¶ 34 (quotation simplified). And in light of this deference, an appellate court reverses a district court's ruling under rule 403 only if the ruling "was beyond the limits of reasonableness." *Beverly*, 2018 UT 60, ¶ 56 (quotation simplified). If an appellate court "can imagine two equally reasonable trial court judges reaching different conclusions about the admissibility of [the] evidence under rule 403 in the exercise of their discretion," the court affirms. *State v. Burke*, 2011 UT App 168, ¶ 42, 256 P.3d 1102.

¶39 As discussed above, the district court concluded that Jane's testimony was "probative with regard to similarity," "probative with regard to the interval," and "definitely probative with regard to [the] allegation of fabrication." The court also concluded that the State had a "need" for the evidence given the "he said/she said" nature of the case and "the very fact that there was prior consensual sex the night before." In the court's view, there wasn't "any other alternative evidence that exist[ed] with regard[] to consent or fabrication," which it treated as "part of the 403 analysis." Turning to the potential for unfair prejudice, the court

acknowledged the difficulty in instructing the jury not to "think of this in the terms of propensity," observing that "no matter how we say it, it's going to be prejudicial." But the court then expressed its view that with an appropriate limiting instruction, "the probative value would far outweigh the prejudicial effect on the jury." As noted, the court gave such an instruction before Jane's testimony and again as part of the final instructions. In light of its assessment of the probative value against the danger of unfair prejudice, the court chose to admit the evidence.

¶40    Simpson nevertheless argues on appeal that the district court's analysis was flawed in several respects. We address each of his arguments in turn.

¶41    First, Simpson challenges the district court's conclusion that the incident involving Jane had enough probative value to justify admission. In reviewing his arguments, however, we note that Simpson has not challenged the district court's initial conclusion that Jane's testimony was relevant under rule 402. "Rule 402 requires that evidence be relevant, which is defined in rule 401 as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Green*, 2023 UT 10, ¶ 63 (quotation simplified). The district court held that the evidence was relevant to the overarching issue of "the credibility of the parties with regard to whether there was consent or there wasn't consent," and Simpson has not argued on appeal that this rule 402 determination was flawed. Indeed, at oral argument, his appellate counsel conceded that "this is squarely a 403 case."

¶42    Relatedly, we also note that Simpson has not challenged the district court's conclusion that Jane's testimony was admissible for a proper non-character purpose under rule 404(b). "Rule 404(b) prohibits the admission of evidence of a crime, wrong, or other act when offered to prove a person's character in

order to show that on a particular occasion the person acted in conformity with the character," but "the rule goes on to say that this type of evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* ¶ 68 (quotation simplified). Here, the district court held that the evidence was admissible for the "non-character purpose" of rebutting Simpson's allegation "that the non-consensual part of this act was fabricated by [Susan]." In light of our supreme court's recent decision in *Green*, Simpson conceded in his brief that "rebut[ting] a defense of fabrication" can be a proper, non-character purpose. *Id.* ¶ 70 (holding that under "the plain text of the rule" prior bad acts evidence "may be admissible to rebut a fabrication defense"). And again, at oral argument, his appellate counsel conceded that Simpson was not challenging the district court's rule 404(b) determination, explaining that "this is squarely a 403 case."

¶43    Thus, on the nature of the arguments presented to us, the starting point is that the evidence in question was relevant to questions of consent and fabrication. In light of this, it seems that the evidence had at least some probative value as to those contested issues.

¶44    Second, Simpson contends that the incidents were not similar enough to support admission. As an initial matter, we note that Utah's courts have considered similarity in relation to both the probative value prong of rule 403 and its unfair prejudice prong. *Compare State v. Lowther*, 2017 UT 34, ¶ 36, 398 P.3d 1032 (explaining that "similarities between the charged and uncharged incidents . . . aid[] in assessing the probative value of a body of prior bad acts evidence" (quotation simplified)), *with Green*, 2023 UT 10, ¶ 78 (explaining that "the similarities among the women's accounts reduced the tendency for the jury to decide upon an improper basis"), *and State v. Meik*, 2024 UT App 46, ¶ 55, 547 P.3d 878 (explaining that "the danger of unfair prejudice was reduced

by . . . the similarities to this case"), *cert. denied*, 554 P.3d 923 (Utah 2024). While the parties' briefs have mostly focused on similarity as it relates to the potential for unfair prejudice, the district court held that Jane's testimony was "probative with regard to similarity." Thus, it seems to have used similarity as part of its analysis of rule 403's probative value prong. Since we're reviewing the district court's ruling, we'll follow suit and address similarity in terms of this prong too.

¶45   On that question, the two sides have very different views of how similar the incidents at issue really were. Simpson contends that "the two acts were not similar at all," and he points to a series of factual distinctions between the two incidents. By contrast, the State argues that "they were strikingly similar," and in making this argument, the State relies on a list of similarities that mirrors and even amplifies the list given by the district court in its analysis.

¶46   A rule 403 similarity determination is context-specific, calling upon the court to first identify the relevant factual details involved in the respective incidents. After identifying those details, the question then becomes comparative. It turns on how similar the two incidents are, or, to put it slightly differently, whether they're similar enough so as to justify admitting evidence of one incident in a trial that's about the other. In this sense, "a proper rule 403 analysis doesn't require that the past incidents be identical; rather, what's at issue is the degree of similarity." *State v. Forbush*, 2024 UT App 11, ¶ 45, 544 P.3d 1 (quotation simplified), *cert. denied*, 550 P.3d 995 (Utah 2024). But because this question turns on the degree of similarity, which poses something of an imprecise question, it's properly viewed as being part of the court's overall balancing. And because that balancing is itself the thing to which an appellate court gives deference, this, too, is a determination to which an appellate court should give deference. *See, e.g.*, *Beverly*, 2018 UT 60, ¶ 56 (noting that a district court has "considerable freedom" to apply rule 403 "to the facts" of the case

(quotation simplified)); *Francis*, 2015 UT App 119, ¶ 34 (noting that "the trial court is granted broad discretion when weighing the probative value of evidence against the reasons for exclusion enumerated in rule 403" (quotation simplified)).

¶47    As noted, the district court here identified several commonalities between the incidents involving Jane and Susan. These included similarities in age, the locations of the sexual encounters, the nature of the relationships between Simpson and the women, the particular acts and escalation of the sexual contact (namely, that both incidents began with unwanted digital penetration followed by unwanted sexual intercourse), the fact that each woman had verbalized a "no," and the fact that Simpson did not wear a condom.

¶48    In his arguments on appeal, Simpson nevertheless contends that many, if not most, of these things would be common to many sexual encounters involving college students, and he accordingly argues that these incidents were simply not similar enough, or similar enough in meaningful ways, to justify admission of Jane's testimony. But no two incidents are perfectly similar—there will always be some potential point of difference. And whether particular points of similarity between two incidents are sufficiently meaningful depends on the context of the encounters. As explained, the question of a particular piece of evidence's probative weight (i.e., meaningfulness) in light of its context is one on which we give deference to the district court's judgment, as is the question of sufficient similarity generally. As also explained, for purposes of this appeal, we take it as a given that, however similar or dissimilar these incidents were, they were at least similar enough to satisfy rule 402's relevancy standard, as well as rule 404(b)'s requirement that the evidence be related in some measure to a non-character purpose. In light of all this, and having carefully reviewed both the broader record and Jane's testimony, "we cannot say that the district court abused its broad discretion in concluding that the similarities among the

women's accounts reduced the tendency for the jury to decide upon an improper basis and that the danger of unfair prejudice did not substantially outweigh the evidence's probative value." *Green*, 2023 UT 10, ¶ 78. Put differently, even with the dissimilarities identified by Simpson on appeal, we cannot say that the list of similarities relied on by the district court was so unpersuasive that its resultant decision to admit the evidence was an abuse of discretion.[9]

¶49  Third, Simpson claims that the district court's rule 403 analysis was flawed because the court did not "articulat[e] or weigh[] permissible or impermissible inferences." In Simpson's view, this was required by *State v. Richins*, which held that the "district court needed to identify the likely inferences the jury would draw from the other-acts evidence." 2021 UT 50, ¶ 103, 496 P.3d 158, *abrogated on other grounds by Green*, 2023 UT 10.

---

9. To be clear, if a court admits evidence over a rule 403 objection, the party who opposed admission could still argue to the jury that the incidents in question were not sufficiently similar so as to have any meaningful probative value. In this sense, we again recognize that there is a difference between the question of whether evidence is admissible under rule 403 (which is a question for the court) and the question of how much weight ultimately should be given to it (which is a question for the jury). *See, e.g., State v. Anderson*, 2020 UT App 135, ¶ 26, 475 P.3d 967 (recognizing, within a rule 403 analysis, a distinction between concerns that went to the evidence's weight and concerns that went to its admissibility); *State v. Burke*, 2011 UT App 168, ¶ 51, 256 P.3d 1102 (same); *State v. Cosey*, 873 P.2d 1177, 1182 (Utah Ct. App. 1994) (same). Here, the district court never prevented Simpson from arguing to the jury that it should discount or disregard the incident involving Jane because the incidents were not sufficiently similar.

¶50   We have some question about whether the court was indeed required to articulate, on the record, a list of inferences in the manner suggested by Simpson. As noted, Simpson relies on *Richins*. But in our view, that portion of *Richins* was likely abrogated by *Green*. Like Simpson, the defendant in *Green* argued that "the court failed to weigh competing inferences," and he pointed to *Richins* for support. 2023 UT 10, ¶ 74. After noting that the review in *Richins* "was conducted under the doctrine-of-chances framework," a framework that has since been abandoned, our supreme court explained that its "holding in *Richins* is therefore less relevant." *Id.* ¶ 75. And our supreme court has indeed moved the rule 403 analysis away from extra-textual lists or requirements. *See, e.g., Lowther*, 2017 UT 34, ¶ 1 ("In applying rule 403, a court is not required to consider any set of factors or elements, but is bound by the language of the rule.").

¶51   In any event, even if something like this was required, we see no error here because the district court did articulate and weigh the competing inferences. In its ruling, the court expressly identified the permissible inferences, stating that the evidence was "probative with regard to similarity," "probative with regard to the interval," and "probative with regard to [the] allegation of fabrication." It also identified what it saw as the principal impermissible inference, stating that it was worried that the jury might use this evidence for "propensity." And the court then conducted an on-the-record weighing, acknowledging its obligation to "weigh[] the materiality or the probative value versus prejudicial" and concluding that, with an appropriate limiting instruction, "the probative value would far outweigh the prejudicial effect on the jury." We accordingly see no error in the nature of the court's analysis.

¶52   Fourth, Simpson claims that the district court erred by affirmatively considering "necessity and other evidentiary alternatives" in its rule 403 analysis. In his view, it was an error to

consider these things because they are part of the overruled *Shickles* factors.[10] We disagree.

¶53 For many years, Utah courts considered the so-called *Shickles* factors when conducting a rule 403 analysis. *See generally State v. Shickles*, 760 P.2d 291 (Utah 1988), *abrogated by State v. Doporto*, 935 P.2d 484 (Utah 1997). Those factors were "the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility." *Forbush*, 2024 UT App 11, ¶ 37 (quotation simplified). In 2014, our supreme court clarified that while "some of these factors may be helpful in assessing the probative value of the evidence in one context, they may not be helpful in another." *State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841, *abrogated on other grounds by Thornton*, 2017 UT 9.

¶54 Simpson's claim focuses on the "necessity and other evidentiary alternatives" factors. But no case has said that a district court can't consider these particular factors in a rule 403 analysis. And again, in *Lucero*, our supreme court held that in some cases, "some of" the *Shickles* factors "*may* be helpful" in assessing probative value. *Id.* (emphasis added). And in *State v. Cuttler*, 2015 UT 95, ¶ 19, 367 P.3d 981, the court likewise

---

10. The State contends that this point was unpreserved below. Simpson, however, contends that this "is not an independent appellate issue; it is merely an argument supporting whether the court got its rule 403 ruling right." We decline to weigh in on the preservation question here because the merits of this claim can easily be resolved in the State's favor. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved *in favor of the party asserting that the claim was not preserved*, we readily may opt to do so without addressing preservation." (emphasis in original)).

recognized that it "may very well be appropriate" for a court to consider some of the *Shickles* factors in a rule 403 analysis. These statements undermine, if not refute, the broader claim Simpson makes here. Moreover, as we recently recognized, the two things that are now prohibited in a rule 403 analysis are (1) "for a district court to moor its rule 403 analysis entirely and exclusively to all of the *Shickles* factors" and (2) "for a court to consider the sixth *Shickles* factor (the degree to which the evidence probably will rouse the jury to overmastering hostility) . . . because that standard presents both a stricter and looser metric than the one at issue in rule 403." *Forbush*, 2024 UT App 11, ¶ 38 (quotation simplified). Simpson does not claim that the court exclusively moored its analysis to these or any other *Shickles* factor, nor does he claim that by referencing these factors at all, the district court violated the prohibition on using the "overmastering hostility" factor.

¶55 As to the question of how these particular factors can play into a rule 403 analysis, we recognize, as we did above, that our supreme court has recently cautioned against adding extra-textual requirements to the rule 403 analysis. But we don't regard an analysis of need or evidentiary alternatives as violating this imperative. Instead, we see these questions as being a natural extension of the probative value inquiry. *See, e.g.*, *State v. Lewis*, 2024 UT App 96, ¶ 26, 553 P.3d 1081 ("It is also appropriate to consider the availability of other, less prejudicial, means of proof. If an evidentiary alternative has equal or greater probative value and poses a lower risk of unfair prejudice, the trial court should discount the probative value of the disputed evidence and exclude it if the risk of unfair prejudice substantially outweighs its discounted probative value. But if the relative need for the evidence is critical, the court is less likely to exclude it under rule 403." (quotation simplified)), *cert. granted*, -- P.3d -- (Utah 2025); *Anderson-Wallace*, 2021 UT App 10, ¶ 19 ("The probative value of evidence is judged by the strength of the evidence and its ability

to make the existence of a consequential fact either more or less probable *and the proponent's need for the evidence*." (emphasis added, quotation otherwise simplified)). And this seems to be how the district court used the State's need and the lack of other evidentiary alternatives here. After referencing the State's "need" for the evidence, the court said, "[t]hat's part of the [r]ule 403 analysis." The court then elaborated on how the evidence was probative with regard to consent, particularly given Simpson's allegation that Susan fabricated her nonconsent and "the very fact that there was prior consensual sex the night before." And after noting the lack of "any other alternative evidence that exist[ed] with regard[] to consent or fabrication," the court explained that this "is part of the 403 analysis." As a result, we see no basis for concluding that the district court abused its discretion by considering these factors in the manner that it did.

¶56 Fifth, as noted, the district court concluded that the danger of unfair prejudice was mitigated to some degree by the limiting instruction that it gave before Jane's testimony (and again as part of its final instructions). On appeal, Simpson claims that this instruction was inadequate—and, thus, that the court's weighing should be reversed. We again disagree.

¶57 When evidence of a prior bad act is admitted against a defendant in a criminal case, the district court may issue a limiting instruction "to offset the danger of unfair prejudice." *Green*, 2023 UT 10, ¶ 80. And if such an instruction is given, it may have "a material impact on the rule 403 balancing." *Id.* (quotation simplified). This isn't to say, of course, that a limiting instruction alone will always be enough to render evidence admissible. Again, rule 403 contemplates that a court will balance the evidence's probative value against the danger of unfair prejudice. Depending on the particular circumstances at issue, it may be the case that a limiting instruction alone might not be enough to tip the scales toward admissibility. Moreover, we recognize that not every instruction is created equal. As stated by our supreme court,

"a general instruction that [makes] no reference to specific evidence" or that is essentially "a near-verbatim repetition of the contents of [rule] 404(b)" is "unlikely to overcome any undue prejudice caused by admission of the evidence." *State v. Bell*, 770 P.2d 100, 111 & n.23 (Utah 1988).

¶58   In an optimal world, a limiting instruction in the rule 403 context will instruct the jury on two points: (1) the purposes for which the jury *can* use the evidence and (2) the purposes for which the jury *can't* use the evidence. With respect to the former, this is presumably why Utah's model instruction for rule 404(b) includes bracketed language saying that "practitioners must specify proper non-character purpose such as motive, intent, etc. and to which issue(s) it applies."[11]

---

11. In full, this model instruction provides:

> You (are about to hear) (have heard) evidence that the defendant [insert 404(b) evidence] (before) (after) the act(s) charged in this case. This evidence (is) (was) not admitted to prove a character trait of the defendant or to show that (he) (she) acted in a manner consistent with that trait. You may consider this evidence, if at all, for the limited purpose of [practitioners must specify proper non-character purpose such as motive, intent, etc. and to which issue(s) it applies]. Keep in mind that the defendant is on trial for the crime(s) charged in this case, and for (that) (those) crime(s) only. You may not convict the defendant simply because you believe (he) (she) may have committed some other act(s) at another time.

Model Utah Jury Instructions 2d CR411 (2024), https://legacy.utcourts.gov/muji/?cat=2 [https://perma.cc/5KR6-F3S5] (alterations and notations in original).

¶59    Here, the instruction clearly instructed jurors on the latter—i.e., the purpose for which they could not use the evidence. In relevant part, the instruction told jurors: "The law does not allow you to convict Mr. Simpson or punish him simply because you believe that he . . . may have done things, even bad things not specifically charged as crimes in this case." And the instruction also instructed jurors on at least some of the purposes for which they could use the evidence. It told jurors: "You may use the evidence offered by [Jane] only to help you decide whether [Simpson] had non-consensual sexual intercourse with [Susan], the alleged victim in this case, and for other purposes listed below." Continuing, it told jurors that "[e]vidence may be used or may be admissible for other purposes such as proof of motive, intent, plan, knowledge or absence of mistake or accident."

¶60    As Simpson points out, however, the instruction was nevertheless incomplete with respect to the purposes for which the evidence could be used. Again, the district court had previously ruled that Jane's account would be admissible for the purpose of rebutting the defense of fabrication, but the instruction failed to tell jurors that they could use this justification for this purpose. We take the point, and we agree with Simpson that the instruction here would have been better and more complete if it had included this additional language.

¶61    Even so, we don't see this as being a basis for reversing Simpson's convictions. Simpson's claim on appeal is that because the instruction did not include language about rebutting a fabrication defense, the instruction essentially invited the jury to consider the evidence for propensity instead—in Simpson's words, "it invited the jury to infer that, 'because he did this type of thing before, he did it this time.'" (Quoting *Richins*, 2021 UT 50, ¶ 105.) But the instruction specifically told jurors not "to convict Mr. Simpson or punish him simply because you believe that he . . . may have done things, even bad things not specifically charged as crimes in this case." Importantly, this is similar to the

instruction given (and later upheld) in *Green*, which stated, "You may not convict a person of a crime simply because you believe he may have committed some other act at another time." 2023 UT 10, ¶ 80 (quotation simplified). Here, we have no reason to believe that the jury disregarded the court's instruction to not consider propensity. *See State v. Suhail*, 2023 UT App 15, ¶ 142, 525 P.3d 550 ("Jurors are presumed to have followed a trial court's instructions." (quotation simplified)), *cert. denied*, 531 P.3d 730 (Utah 2023). And we'd also be hesitant to assume this here, given that the prosecutor reiterated this point in his closing argument, telling jurors, "Lastly you heard from [Jane]. And you're specifically instructed obviously not to consider a negative character inference related to that, and you should read through that instruction and only use the evidence for its intended purpose."

¶62 In light of all this, we cannot say that the district court abused its discretion under rule 403 when it "determined that the danger of unfair prejudice was mitigated . . . by the limiting instruction." *Green*, 2023 UT 10, ¶ 80. Although the instruction may not have been as helpful as it could have been, it still did a lot of the work that a limiting instruction should ordinarily do in this context. Given the deference that we give to district courts on rule 403 balancing questions generally, we cannot say that the deficiency in this instruction was so pronounced that the instruction could not play some role in overcoming the danger of unfair prejudice, or, by extension, that it constitutes reason to overturn the court's overall balancing.

¶63 As a final matter, Simpson claims that the district court failed to mitigate the danger of unfair prejudice by not requiring the State to introduce Jane's account through a stipulation, as opposed to live testimony. In response, the State contends that Simpson "never raised this issue with the trial court" and that it's accordingly unpreserved. In his reply, Simpson did not claim otherwise. The claim fails for this reason alone.

¶64    In any event, while it's true that "a stipulation that . . . sanitize[s] the other-acts evidence by removing salacious and extraneous details" may be an option in some cases, *Richins*, 2021 UT 50, ¶ 106, Simpson points to no case that imposed it as a requirement. And here, we don't regard this case as being so close that the district court could only choose to admit the testimony if it were given to the jury by stipulated account, as opposed to instead permitting the State to call Jane as a live witness at trial.


## CONCLUSION

¶65    For the foregoing reasons, we reject Simpson's claim that the district court abused its discretion under rule 403 by allowing the State to present testimony from Jane about the prior sexual assault. We accordingly affirm Simpson's convictions.

———————